**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | | |
|---|---|---|
| SEYED AKHAVI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: _____ |
| | ) | |
| THOMAS NELSON COMMUNITY COLLEGE, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

---

## COMPLAINT

---

**COMES NOW** Plaintiff, SEYED AKHAVI ("Dean Akhavi" and/or "Plaintiff"), by and through counsel and pursuant to the Federal Rules of Civil Procedure, and for his cause of action against Defendant, THOMAS NELSON COMMUNITY COLLEGE (the "College" and/or "TNCC"), alleges as follows:

### I.      BRIEF STATEMENT OF CLAIM

1.      This civil action arises from Dean Akhavi's wrongful suspensions and non-reappointment during his employment with Thomas Nelson Community College based, in whole or in part, upon race, gender, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and the Civil Rights Act of 1866, as amended, by the Civil Rights Restoration Act of 1991, 42 U.S.C. §§ 1981 and 1983.

2.      On July 18, 2016, TNCC hired Plaintiff as the Dean of Science, Engineering, and Technology ("SET").

3.      The first three (3) years of Plaintiff's employment were filled with compliments in recognition of his vast accomplishments in furthering the missions of SET and TNCC.

4.      From July 2019 through February 2020, Dr. Susan English, the Vice President of Academics and Workforce at TNCC and Dean Akhavi's supervisor ("Dr. English"), engaged in a systemic pattern of discriminatory conduct based on Dean Akhavi's race and sex and retaliated against him for opposing her discriminatory conduct ("Discriminatory Events").

5.      On March 6, 2020, Dean Akhavi, through counsel, grieved the Discriminatory Events (*see* Exhibit A).

6.      On May 28, 2020, a Faculty Grievance Ad Hoc Committee (the "Committee"), convened and trained by TNCC's Department of Human Resources ("HR"), heard testimony and considered all relevant evidence.  The Committee's 33 page confidential decision dated June 11, 2020 found the College was responsible for the Discriminatory Events and recommended remedial actions.  This decision was subject to TNCC's President's final determination.

7.      On June 26, 2020, TNCC's Interim President, Gregory T. DeCinque (the "President"), overturned the Committee's decision -- *i.e.,* he did not support the conclusions of the Committee and upheld Dr. English's decision to suspend Dean Akhavi and her interpretation of the Virginia Community Colleges System ("VCCS") policy not to reappoint him -- based on his [the President's] conclusion that the Committee exceeded the scope of the purpose for which it was established (*see* Exhibit B).

8.      Paragraph 3.12.1(b) of the VCCS Policy Manual provides "[f]aculty may be nonreappointed only for just cause.  Permissible grounds for nonreappointment shall include but are not limited to incompetence, unsatisfactory job performance, insubordination, or misconduct."

9.     On or about June 27, 2020, Dean Akhavi sought an investigator's review, who was hired by the College, of his removal as the Dean of STEM (*see* Exhibit C), which returned a confidential decision in TNCC's favor on July 1, 2020.

10.    On July 13, 2020, Dean Akhavi petitioned the Vice Chancellor of the VCCS to review his claims (*see* Exhibit D); and on August 7, 2020, the VCCS agreed with TNCC's decision (*see* Exhibit E).

11.    This action is filed to vindicate violations of Plaintiff's civil rights and to redress Defendant's unlawful and discriminatory conduct and employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 2000e *et seq.,* and the Civil Rights Act of 1866, as amended by the Civil Rights Restoration Act of 1991, 42 U.S.C. §§ 1981 and 1983.  Plaintiff seeks damages and equitable relief, based on discrimination and retaliation, undertaken by Defendant and its officers, agents, and/or employees against Plaintiff based on his race, gender, and participation in a protected activity.  All acts complained of herein occurred exclusively within the Commonwealth of Virginia.

## II.     **JURISDICTION AND VENUE**

12.    This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. §§ 2000e, *et seq.*; the Civil Rights Act of 1966, as amended by the Civil Rights Restoration Act of 1991, 42 U.S.C. §§ 1981, 1981a, and 1983.  Jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1343 to redress the unlawful deprivation of Plaintiff's rights secured, guaranteed, and protected by federal law.  This Court also has jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 regarding declaratory judgments.

13.    Venue is proper in the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. §§ 139l(b) and 1391(c), where Defendant regularly conducts

business, where all the wrongful conduct occurred, and where Plaintiff was employed when all complained-of acts occurred.

### III.    THE PARTIES

14.    Plaintiff, Seyed Akhavi, an Iranian male and Newport News resident, had been an employee of TNCC from July 2016 to June 2020.  From the start of his employment, Plaintiff performed his duties in a professional and outstanding manner.

15.    Defendant, TNCC, is an employer as defined under 42 U.S.C. § 2000e(b). TNCC employs more than five hundred (500) employees and has done so at all times pertinent to this action. It is one (1) of twenty-three (23) two-year community colleges in the VCCS.  Pursuant to Virginia Code § 23.1-2901, VCCS is known as a corporation under the style of "the State Board for Community Colleges" that establishes, controls, and administers a statewide system of publicly supported comprehensive community colleges in the Commonwealth of Virginia.  TNCC is "person" subject to suit within the meaning of 42 U.S.C. §§ 1981 and 1983.  TNCC, located on Thomas Nelson Drive in Hampton, Virginia, is accredited by the Southern Association of Colleges and Schools Commission on Colleges to award associate degrees.

### IV.    ADMINISTRATIVE PREREQUISITES

16.    On August 19, 2020, Plaintiff filed a charge of discrimination based on national origin, race, sex, and retaliation against Defendant with the U.S. Equal Employment Opportunity Commission office located at 200 Granby Street, Suite 739, Norfolk, Virginia 23510 (the "EEOC").  The charge was amended on September 24, 2020 to allege discrimination based on race, sex, and retaliation (*see* Exhibit F).

17.    On November 2, 2020, EEOC concluded its investigation, dismissing Plaintiff's charge (*see* Exhibit G).

18.     On November 5, 2020, EEOC issued Plaintiff a right to sue letter (*see* Exhibit H).  Suit has been brought within ninety ((90) days of Plaintiff's receipt of the Notice of Right to Sue, consistent with Title VII of the Civil Rights Act of 1964, as amended.

19.     Plaintiff has exhausted all required administrative remedies and procedures for filing this action.

## V.      STATEMENT OF FACTS

20.     Following TNCC's hire of Plaintiff on July 18, 2016 as the Dean of SET, the first three (3) years of Plaintiff's experience were full of accomplishments, including but not limited to increasing the community involvement to narrowing the differences between disciplines and faculty by emphasizing the coherent nature of the Science, Technology, Engineering, and Mathematics ("STEM") education.  His decisions and actions were praised by Dr. English and then President Dr. Dever.  Dean Akhavi led the $2.5 million grant from the Department of Labor efforts, which was used to support the purchase of equipment at Continental,[1] creating and expanding the Mechatronics program at New Horizon and offering scholarships to students who were pursuing degrees in selected programs. Dean Akhavi was a major contributor on behalf of the College to the Digital Shipbuilding and Repair Advisory Board.[2]

21.     While Dean Akhavi did not receive any performance evaluations until 2019, for over three (3) years, feedback and assessments from Dr. English and others were extremely

---

[1]     Continental is a German-based company located in Newport News, Virginia that makes automotive powertrain systems.  Through its partnership with TNCC, Continental intended to train its employees and other manufacturing companies to address its machining workforce needs. TNCC purchased equipment and placed them at Continental's site for training purposes.

[2]     This Board operated under the digital shipbuilding and repair industry in the Tidewater region. Many partners, including academic institutions, participated in developing curriculum for future shipbuilders and repair workers.

complimentary. In addition to his accomplishments in the preceding paragraph, Dean Akhavi initiated applying for a G3 Planning Grant ("G3 Grant") in excess of $300,000 and diligently worked on it up and following his first suspension.

22.     The G3 Grant Program is a financial opportunity for in-state students from low- and middle-income families who enroll in technology, skilled trades, healthcare, early childhood education, or public safety programs. It has three (3) levels of achievement goals – (1) introductory-level semester certificates, (2) advanced technical semester certificates, and (3) associate degrees. As directed by VCCS, the primary focus targets getting Level 1 certificates approved in September 2019 and the second and third levels approved by the end of Spring 2020. "Last dollar" planning under G3 is an option for students who were unable to obtain financial aid for all their classes. At the end of the day, it is impossible to track how many students could have taken advantage of the G3 grant when Dr. English halted planning prematurely.

23.     In or around 2017-2018, TNCC experienced a $1.7 million shortfall that led to its reclassification from a Level IV to a Level III institution. This shortfall was due, in part, to low enrollment and budget missteps. As a result of its unstable financial position, TNCC instituted layoffs and other budgetary adjustments. For consecutive years in and around this timeframe, the survey of College employees' satisfaction indicated low morale and employees' dissatisfaction with how the College was operating and functioning.

24.     Further reductions-in-force ("RIF") were implemented during the 2019-2020 academic year, resulting in the academic division being reorganized from four (4) to three (3) divisions: (a) Science, Technology, Engineering, and Mathematics; (b) Public Services and Health Professions; and (c) Communications, Humanities, Social Sciences, and Business.

A.      Suspensions

25.     On January 4, 2019, Dean Akhavi notified Dr. Elena Kuchina that, effective as of the Spring 2019 semester, she would be relieved of her responsibilities as Chair of the Science Department due to poor performance.  This decision was made with Dr. English's prior consent. Before Dean Akhavi informed Dr. Kuchina of his decision, she already asked other faculty members to replace her; yet on or about October 19, 2018, Dr. Kuchina accused Dean Akhavi of retaliation, gender discrimination, and creating a hostile work environment.

26.     Also on or around October 19, 2018, Dr. Kuchina requested that Dean Akhavi's professional qualifications and psychological health be evaluated and wrongfully accused Dean Akhavi of stealing money from a grant.

27.     Dean Akhavi was never provided specifics of Dr. Kuchina's allegations.  He only was told the College will address the allegations in a confidential manner regarding its finding of retaliation.  Upon information and belief, however, Dean Akhavi believes Dr. Kuchina's gender discrimination claim was based on her Chair position being reassigned to two (2) males.

28.     Dean Akhavi asked a female faculty member, Riham Mahfouz, to replace Dr. Kuchina before two (2) male faculty members agreed to Co-Chair the Science Department.

29.     Even after her removal as Chair of the Science Department, Dr. Kuchina maintained her full-time faculty position as well as her position as Chair of the Physics Department.

30.     VCCS Policy 3.12.3(d) provides, in part, "[]he vice president/executive vice president/ provost shall ensure that an investigation be conducted and completed within thirty (30) calendar days of the start of the suspension."

31. On July 25, 2019, Dr. English issued Dean Akhavi a Letter of Reprimand following her investigation of Dr. Kuchina's allegations that she admits was completed as of May 31, 2019 (*see* Exhibit I). Hence, the investigation was completed *219* days after the complaints were received; and Dr. English notified Dean Akhavi of the results *55* days after the investigation was complete.

32. Dr. English's July 25, 2019 Letter of Reprimand supported a finding of retaliation and required Dean Akhavi to be educated on ethics and professional communication. She found no basis to investigate Dean Akhavi's professional qualification or evaluate his psychological health. Subsequently, TNCC discovered the grant money "was absorbed" by the College.

33. Dr. English notified Dean Akhavi about the next step, which was requesting the President, Dr. Dever, to review his appeal within ten (10) days.

34. On September 25, 2019, Dean Akhavi notified the President and HR of his intention to grieve Dr. English's decision. He never received any acknowledgment or response to this communication.

35. In or around May 2019, Deborah Lichniak made four (4) assertions of retaliation against Dean Akhavi, two (2) of which were unsupported and the other two (2) were found meritless.

36. In or around the weeks of July 9-17, 2019, TNCC's Human Resources Department ("HR") shared complaints against Dean Akhavi from Rhonda Scott (G3 Project Coordinator, BPSISM and Health Professional) and Cherie Aukland (Associate Professor of Information System Technology, Program Head for Geographical Information Systems).

37. On July 10, 2019, Ms. Scott accused Dean Akhavi of workplace harassment and workplace misconduct.

38.     On July 17, 2019, Ms. Aukland accused Dean Akhavi of intimidation and demeaning behavior.

39.     Dean Akhavi promptly disputed all allegations from Messes. Scott and Aukland.

40.     Dean Akhavi was placed on paid suspension beginning July 18, 2019 for twenty-one (21) days while HR investigated the allegations.

41.     Before the investigation was completed and prior to receiving any details from Dr. English, Dean Akhavi's name and picture were removed from the website and replaced with the identity of an Acting Dean.

42.     Upon his return from the first suspension, Dean Akhavi continued to perform his duties in a timely, professional, and exemplary manner.

43.     On August 29, 2019, Dr. English issued Dean Akhavi another Letter of Reprimand stating she investigated complaints from Ms. Scott and Ms. Aukland, including written reports, voluntary written statements, and other evidence provided by the parties and witnesses; and using the required preponderance of the evidence standard, she found him guilty and suspended him without pay for twenty-one (21) days (*see* Exhibit J).

44.     It is unclear whether Dr. English properly applied the burden shifting requirements under *McDonnell Douglas v. Green*, 411 U.S. 792 (1972). Nevertheless, Dean Akhavi denies he was given *specific* facts of Messes. Scott's and Aukland's allegations and thus denied an opportunity to adequately respond to them.

45.     G3 Grant Program Coordinator for Science, Engineering and Technology Programs ("SET") Leila LaRoch provided Dean Akhavi with a 4.5-page detailed summary of Ms. Scott's rude, disruptive behavior towards Dean Akhavi as well as others in the SET Division, which was forwarded to HR. It is unclear what weight, if any, was afforded Ms. LaRoch's detailed log given

that Dr. English's August 29, 2019 letter states "Dean Akhavi's behaviors and statement [toward Ms. Aukland] were found to be inappropriate for the work environment."

46.     Dr. English's conclusions were shared with Dean Akhavi almost seven (7) months after Dr. Kuchina's grievance was filed and while Dean Akhavi was enduring the first suspension.

47.     Dean Akhavi's first suspension was punitive even though he was suspended with pay.  In July 2019, his name and picture were removed from the Leadership page of the College's website as the Dean, and the Acting Dean's name and picture were inserted.  Despite promptly questioning Dr. English about the removals and asking that his information be reinserted, Dean Akhavi's name and picture were not reinserted until approximately three (3) months later.

48.     According to a comment on a written survey, faculty were told during Dean Akhavi's first suspension that he would not resume any leadership roles, and he was not returning to the division.

49.     Following her alleged investigation of complaints from Messes. Scott and Aukland, Dr. English suspended Dean Akhavi without pay for twenty-one (21) workdays, placed him on a Performance Improvement Plan ("PIP"), and conflict resolution training was ordered.  During this time, he was not allowed on the campus and prohibited from engaging in any activities on behalf of the College.

50.     Dr. English's findings of her investigation of Ms. Scott's claims were shared with Dean Akhavi fifty (50) days after the complaint was made and forty-three (43) days after Ms. Aukland's complaint.

51.     During both suspensions, Dean Akhavi was disassociated from curriculum development, professional activities, budgetary matters, any discussion regarding the Department's reorganization, and any business on the College's behalf.

B.      TNCC's Blatant Fabrications

52.      In addition to the foregoing, TNCC blatantly fabricated several facts during the EEOC process.

53.      TNCC described the reorganization of the Academic Affairs Division to include some employees from the Business, Public Services, Information Systems, and Mathematics Department ("Business Department").  It further claimed employees merging with the newly created STEM department resisted the move under Dean Akhavi's leadership as it claimed was supported, "albeit indirectly," by a Vote of Confidence signed by faculty of the former department.

54.      A Vote of Confidence in Appreciation for the Leadership of Dean Chuck Swaim, the former dean of the Business Department, is irrelevant to the present case.  The only disciplines transferred to Dean Akhavi's division were Information Technology and Mathematics, and the petition contains signatures of staff from disciplines unrelated to the newly created STEM Department.

55.      To support its contention that Dean Akhavi failed to meet his responsibilities under Curriculum Management, TNCC alleged that, "[w]hen Dean Akhavi returned [from suspension], he was immediately returned to the role of Principal Investigator (PI) for the Perkins Grant with all responsibilities and expectations restored." This statement is untrue.  Former Business Division Dean Chuck Swaim managed this grant.  Dean Akhavi was never asked nor instructed to assume Dean Swaim's PI role.  The Perkins Grant was a grant to be implemented by various departments on campus, and Dean Akhavi's responsibility amounted to approximately $60,000 to $70,000 of the $245,000 grant.  Dean Akhavi's division was one of few divisions, if not the only division, that spent all its Perkins Grant funds.

56.     TNCC also accused Dean Akhavi of failing "to produce required updates to his supervisor and other staff involved in curriculum processes." Dr. English removed Dean Akhavi's software rights to approve financials and proposals. He requested access to the curriculog, which was used to monitor and approve curriculum proposals. During Dean Akhavi's suspensions, his access was denied; and his request to regain access was not granted until almost four (4) months later.

57.     TNCC additionally claimed as of January 15, 2020, "Dean Akhavi had not contacted Workforce employees to incorporate them into the STEM leadership team or department." Dean Akhavi rebutted the claim with approximately fifteen (15) emails demonstrating this statement is flagrantly untruthful.

C.      Performance Improvement Plan ("PIP")

58.     Dean Akhavi's PIP targeted three performance goals -- interpersonal, conflict resolution, and communication.

59.     Under Communication, the PIP required Dean Akhavi to "[r]efrain from sarcasm and inappropriate joking that *could be misinterpreted* as retaliatory, intimidating, and harassing behaviors" (emphasis added) – an extremely subjective standard.

60.     Although the conflict resolution goal of "zero incidents of misconduct, harassment, retaliation" is a seemingly impossible task to achieve when considering the environment in which Dean Akhavi was working, he met it as he was not aware of any further complaints.

61.     On February 7, 2020, Dr. English summarized Dean Akhavi's PIP as being unsuccessful because of alleged shortcomings in all three areas of his performance goals.

62.     Dr. English failed to support each allegation with objectively reasonable evidence; and Dean Akhavi explained legitimate, non-discriminatory reasons for each alleged shortcoming.

63.    The PIP was intended to last for sixty (60) days, starting October 1, 2019.  However, the results were not shared with Dean Akhavi until February 2020 – over thirty (30) days later than required per policy.

D.    Non-Reappointment

64.    Paragraph 3.12.1(b) of the HR Policy Manual provides "[f]aculty may be nonreappointed only for just cause.  Permissible grounds for nonreappointment shall include but are not limited to incompetence, unsatisfactory job performance, insubordination, or misconduct."

65.    On January 15, 2020, Dr. English notified Dean Akhavi of her intention to recommend non-reappointment to the President based on unsatisfactory job performance, that is, curriculum processes for multiple programs had been unnecessarily and excessively delayed.  Despite the foregoing, however, TNCC did not suffer financially because of the delays.  Students still were eligible to receive financial support and use the G3 Grant for some of this support.  Dean Akhavi met the requirements for first level support certification.  His area was most difficult, and he implored qualified faculty to teach and otherwise get involved.

66.    On January 25, 2020, Dean Akhavi responded to Dr. English, reminding her (a) of her complimentary opinions of his performance up to this point; (b) not once did she ever mention his unsatisfactory performance; and (c) of his 17 listed accomplishments in recent months.  He also reminded her that critical preparation to meet identified milestones should have occurred while he was suspended.

67.    On February 7, 2020, Dr. English summarily stated she intended to uphold her recommendation without any further detail.

68.    On March 9, 2020, Dean Akhavi grieved his non-reappointment, citing (a) unsubstantiated investigations, evaluations, and other examinations lack veracity and/or

substantive detail to allow him to exercise his due process rights to properly address a few and unrelated complaints against him; (b) personal vendettas, (c) dissimilar reassigned duties after the second suspension, and (d) gender and race-based discrimination (*see* Exhibit A).

69.    In short, Dean Akhavi was penalized for an impossible situation in which Dr. English placed him.  He was wrongfully suspended for approximately seven (7) weeks total, unable to engage in any activities on behalf of the College, then ultimately not reappointed because he allegedly failed to meet critical deadlines.

E.    Investigations

70.    TNCC conducted investigations of four (4) complaints against Dean Akhavi.

a.    Complainant No. 1 -- Deborah Lichniak (a Caucasian) – lodged four (4) retaliation complaints against Dean Akhavi.  Two (2) lacked merit, and the other two (2) were unsupported by probative evidence.

b.    Complainant No. 2 – Elena Kuchina (Caucasian) – finding that Dean Akhavi violated policy of Civility in the Workplace.

c.    Complainant No. 3 – Rhonda Scott (African American) – finding that Dean Akhavi violated policy of Civility in the Workplace.

d.    Complainant No. 4 – Cherie Aukland (Caucasian) – justification for second suspension, letter of reprimand, PIP, and nonreappointment.

71.    Up to August 2019, Dean Akhavi had not received any prior evaluations.  Once the assault on his character and performance was initiated, he was given an unreasonably short period to improve, and he was not afforded reasonable opportunities to correct any alleged shortcomings.

72.    As illustrated in Paragraph Nos. 31, 50, and 63, Defendant failed to implement its own policy properly.  Additionally, when Dean Akhavi sought to grieve his suspension with pay,

Human Resource Director Lynda Byrd-Poller ("HR Director") informed him he could select a cabinet member to review his objection, and he chose the Vice President of Finance. The HR Director returned to admit she was mistaken, and the hearing had to funnel through Dr. English. Then Dean Akhavi's counsel submitted a grievance on March 6, 2020, to which the College was to respond in ten (10) business days. A response was not received from the HR Director until April 9, 2020. While the delay occurred during the spring COVID-19 pandemic, the HR Director did not even forewarn Dean Akhavi of her delay and did not respond to Dean Akhavi's attorney's request on March 31, 2020 for an update until April 9, 2020. Per VCCS Policy Section 3.12.4(c) of the policy, extensions for appeals through the faculty grievance procedure may be extended by mutual written consent. Dean Akhavi was not asked to agree to an extension.

73.    Dr. English relied in part on second-hand information, when, in fact, her findings should have been based on her own careful analyses. She admitted as part of her survey input that her comments were not her first-hand observations and direct experiences, but "looked through the lens or others."

F.    Dissimilar Re-assigned Duties

74.    In Dr. English's February 7, 2020 letter upholding her recommendation of non-reappointment, she states the duties of Dean Akhavi's reassigned position will be reasonably commensurate with his education, experience, performance. They were not.

75.    Dean Akhavi was given two (2) weeks to review 14 webinars, each one requiring 1.5 to 2 hours viewing time, and he is expected to make general recommendations about using web-based enrollment enterprise for the workforce training.    The webinars are interactive and require about 6 hours each to complete the viewing and practices. The College had this tool for three (3) years to be used for multiple businesses conducted by Workforce Development. Dean

Akhavi's reassigned supervisor did not fully understand the program and problems previously encountered, *i.e.*, the TNCC and VCCS programs do not interact, as identified at the VCCS level prior to being assigned to Dean Akhavi. Dean Akhavi is an electrical engineer and had been a dean for over twenty-two (22) years. He is not a web designer. Neither is he an enrollment or finance manager. Additionally, contrary to the requirements of any new hire or reassignment, Dean Akhavi's new title, office location, or work phone was never assigned.

G.    Ad Hoc Grievance Committee Report

76.    In or around April 2020, HR assembled and charged the Committee to:

- review the record,
- hear statements from the grievant (Dean Akhavi) and College representatives,
- review the policies and procedures of the institution,
- deliberate as appropriate, and
- provide a written report to include:
  - the findings of fact,
  - the rationale for their determinations, and
  - a recommendation to the President.

77.    On or about May 18, 2020, Dean Akhavi participated in a hearing conducted by an ad hoc grievance committee assembled and charged by HR.

78.    As detailed in its report dated June 11, 2020, this objectively selected panel of administrative and non-administrative faculty found that the suspensions were overly harsh, unmerited, and unsupported by policy; and, therefore, the nonreappointment was unjustified. Policy was not followed for the first suspension, which adversely affected the second suspension and the determination not to renew his contract. Specifically, the Committee found:

(a) Complainant No. 1 – There was insufficient evidence to support the complaints given that both Dean Akhavi and the complainant contributed to the conflict.

(b) Complainant No. 2 – The Letter of Reprimand was issued seven (7) months after the investigation began, in violation of VCCS Policy 3.2.3 which requires investigations to be completed within thirty (30) calendar days.   Complainant retaliated in inappropriately questioning Dean Akhavi's credentials, falsely claimed he made threatening statements and was paid personally from a grant and requesting that he undergo a psychological evaluation.   Both parties engaged in unprofessional communications.

(c) Complainant No. 3 – The Complainant undermined civility in the workplace, and Dean Akhavi was not given an opportunity to respond to the accusations before disciplinary action was taken against him.

(d) Complainant No. 4 – The complaints were invalid and insufficient bases found to warrant a suspension and other disciplinary actions.

(e) Non-reappointment – Poor performance was not found.  Grant implementation is a team effort, Dean Akhavi was suspended during a critical time of the G3 Grant, the Grant was not behind schedule, two-thirds (2/3) of the grant money was spent before Dean Akhavi was suspended, and the remaining one-third (1/3) should have been spent while Dean Akhavi was suspended. Additionally, Formative/360° Feedback Instrument Survey Results reveal the survey could be taken more than once by any individual, only 8.7-21.7% rated Dean Akhavi's interpersonal skills as unsatisfactory, only 4 of 26 individuals supervised by Dean Akhavi rated his core job and strategic planning skills as unsatisfactory (the same number of complainants), and 5 out of 28 (19.4%) found his interpersonal skills unsatisfactory.  Thus, in every category the majority surveyors rated his performance, fair, good, very good, or excellent.

(f) PIP – Dean Akhavi was charged to "refrain from sarcasm and inappropriate joking that could be misinterpreted as retaliatory, intimidating, and harassing behaviors" The phrase "could be misinterpreted" is indicative of a subjective standard that calls into question reasonableness and cultural appreciation.

(g) Interpersonal Skills – A lunch invitation to a female faculty was appropriate. There is no policy on point, and the invitation should not be a basis for non-reappointment. A meeting invitation to only females was found to "mend a bridge." Dean Akhavi's handling of a student complaint was a positive experience for those involved.

(h) Communication – The Committee did not find Dean Akhavi's November 1, 2019 email "condescending, accusatory, and provoking," which is an the extremely subjective standard.

79. Former Interim President DeCinque failed to provide specific details of how the Committee exceeded the scope of its purpose. Dr. English recommended non-reappointment because of alleged lack of performance, yet Dr. DeCinque contends Dean Akhavi's non-reappointment was an administrative process and not a termination.

H. Comparators

80. Dean Akhavi files this suit on the basis that other similarly situated female, non-Iranian American colleagues made critical mistakes under Dr. English's supervision but were not suspended and/or have been reappointed.

81. Plaintiff submits three material differences exist between himself and his three (3) comparators, *i.e.*, (a) he grieved the Discriminatory Events; (b) he is Iranian American, and (c) his comparators are all Caucasian.

82. Comparator 1: Terry Wagner, Grant Manager (Caucasian female) -- The College

received an announcement about a grant opportunity from the Department of Defense regarding Manufacturing and Engineering Education Program, which was a multi-million dollar opportunity for the College and students. Late President Dever had very high hopes for TNCC to be awarded. In a short period of time, Dean Akhavi provided technical information for the proposal. The Grant Manager did not follow the prescribed protocol for submitting the proposal, using multiple uploads instead of a single one. As the result, the proposal was not even reviewed. Upon information and belief, Ms. Wagner was not subjected to disciplinary actions similar to that Dean Akhavi received.

83.     Comparator 2:  Dr. Lauren Williams, Director, Curriculum and Instruction (Caucasian female) -- During Dean Akhavi's absences due to suspensions, Dr. Williams was given the responsibility of the directing the curriculum through the approval process. She met with Dean Akhavi's G3 faculty and continued to do so after he returned. During the crucial months of July, August, and September, no progress related to the curriculum requirement of the G3 Grant was made. This lack of progress later was blamed on Dean Akhavi and did not subject Dr. Williams to any reprimands. In fact, Dr. Williams received preferential treatment and promoted from the faculty rank by Dr. English without any vetting through the Academic Leadership team.

84.     Comparator No. 3: Jean Frank, Associate Professor and Program Head (Caucasian female) -- was given administrative duties in Dean Akhavi's absence. She was given the role of approver of all curriculum proposals, new and updated, even though one of the two classes Ms. Frank taught, Mechtronics, previously was proposed to be removed from the curriculum. Ms. Frank, therefore, had a self-serving interest in advancing approvals that directly impacted her teaching load. Dr. English kept Ms. Frank as the curriculum approver two (2) months after Dean Akhavi returned from suspension.

## COUNT I
## SEX-BASED DISCRIMINATION

85.    Plaintiff incorporates by reference all allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

86.    42 U.S.C. § 2000e-2(a) provides it is an unlawful employment practice for an employer:

> (1) … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

87.    A plaintiff in a sex or gender-based discrimination claim must show he was: (a) a member of a protected class; (b) qualified to do the job; (c) subjected to an adverse employment action; and (d) similarly situated employees outside of the protected class were treated differently.

88.    Dean Akhavi is a member of a protected class – he is a male.

89.    Dean Akhavi was and is qualified to perform responsibilities as Dean of the STEM Department, as he was satisfactorily was employed as a dean for approximately twenty-two (22) years and three (3) years prior to the complained of Discriminatory Events.

90.    Dean Akhavi was subjected to adverse employment actions in that he was suspended twice and ultimately not reappointed as the Dean of the STEM Department.

91.    Similarly situated Caucasian and African American females were treated differently. All complaining and decision-making individuals identified herein who have attacked Dean Akhavi's character and performance, and TNCC's adverse employment actions, are precipitated by females. Moreover, all comparators who were treated preferentially are females.

92.    Dean Akhavi's wrongful suspensions and nonreappointment deprived him of his employment opportunities as Dean of the STEM Division.

93.    Nonreappointment is akin to termination. *See McDonough v. Trustees of the University System of New Hampshire*, 704 F.2d 780, 781 (1st Cir. 1983) ("This method of termination by nonreappointment was authorized by the collective bargaining agreement that governed the contractual relationship between plaintiff and the college."

94.    During Dean Akhavi's tenure at TNCC, three (3) male deans were employed under Dr. English's direction, who she referred to as the "Boys Club." She is responsible for removing them all. She encouraged one to apply for the provost position and did her best to manipulate the search committee to hire him; later that position was eliminated; another male dean was RIFed; and she did not reappoint Dean Akhavi.

95.    Dean Akhavi has suffered disparate treatment by the actions of some Caucasian and African American females, all of whom have participated in a pattern of championing false, baseless, unsupported allegations, which have caused Dean Akhavi tremendous embarrassment.

96.    Defendant engaged in a "domino effect" of unjustified disciplinary actions against Dean Akhavi. His unwarranted suspensions based on unsubstantiated allegations by four (4) females were used to justify his non-reappointment.

97.    Based on the foregoing, all of Defendant's Discriminatory Events were unwarranted and thus violate Dean Akhavi's federally protected rights; and the comparators identified herein, although perhaps warranted disciplinary action or at least not entitled to the preferential treatment received, were treated much more favorably.

21

## COUNT II
### RACE-BASED DISCRIMINATION

98.     Plaintiff incorporates by reference all allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

99.     A cause of action for discriminatory termination requires Plaintiff to show that: "(1) he was a member of a protected class; (2) he was satisfactorily performing his job at the time of termination; (3) he was terminated from his employment; and (4) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of other employees outside the protected class who received less severe discipline. *Haynes v. Waste Connections, Inc.*, 922, F.3d 219, 223 (4th Cir. 2019).

100.    Plaintiff was a member of a class protected under Title VII against race-based discrimination by his employer; he is Iranian American.

101.    All complaining and decision-making individuals identified herein who have attacked Dean Akhavi's character and performance and TNCC's adverse employment actions are precipitated by Caucasian and African Americans.

102.    Up to and during both suspensions, and during his reassigned duties, Dean Akhavi satisfactorily performed his responsibilities. He "does not have to prove that he was a perfect employee, only that he was performing satisfactorily." *Id.* at 225.

104.    Dean Akhavi's nonappointment has the same impact as being terminated.3

105.    Dean Akhavi was found to have contributed to the conflict involving Complainant No. 1 and engaged in unprofessional conduct with Complainant No. 2. However, he alone was terminated.

106.    Based on the foregoing, all of Defendant's Discriminatory Events were unwarranted and thus violate Dean Akhavi's federally protected rights; and the comparators

identified herein, although perhaps warranted disciplinary action or at least not entitled to the advantageous treatment received, were treated much more favorably.

107. Defendant engaged in a "domino effect" of unjustified disciplinary actions against Dean Akhavi. His unwarranted first and second suspensions based on unsubstantiated allegations by four (4) Caucasians and an African American were used to justify his non-reappointment.

108. Defendant intentionally and/or with reckless indifference, engaged in the above-stated discriminatory practices against Plaintiff, contrary to Plaintiff's federally protected rights as guaranteed to him under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, as amended, and 42 U.S.C. §§ 1981 and 1983.

109. Defendant's intentional and discriminatory conduct complained of herein was willful, wanton, deliberate, malicious, egregious, and outrageous warranting the imposition of punitive/exemplary damages which will serve as an example and deterrent to Defendant and others who would commit similar illegal acts.

110. As a result of Defendant's engagement in discriminatory employment practices with malice or with reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to punitive/exemplary damages in addition to compensatory damages and other remedies available under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, as amended, and 42 U.S.C. § 1981.

**COUNT III**
**RETALIATION**

111. Plaintiff incorporates by reference all allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

112. During his employment with the College, Plaintiff was a member of a class protected under Title VII against discrimination by Defendant.

113.    Title VII clearly prohibits an employer from discriminating against any of its employees because the employee opposes any unlawful practice or for exercising a protected right. *See* 42 U.S.C. § 2000e-3(a). On its website, the EEOC illustrates unlawful employment action as acts to:

- reprimand the employee or give a performance evaluation that is lower than it should be;
- transfer the employee to a less desirable position;
- engage in verbal or physical abuse;
- threaten to make, or actually make reports to authorities (such as reporting immigration status or contacting the police);
- increase scrutiny;
- spread false rumors, treat a family member negatively (for example, cancel a contract with the person's spouse); or
- make the person's work more difficult (for example, punishing an employee for an EEO complaint by purposefully changing his work schedule to conflict with family responsibilities).

114.    To sustain a retaliation claim, a plaintiff must establish a *prima facie* showing (a) that he engaged in a protective activity (such as filing a discrimination complaint or opposing discriminatory activity); (b) his employer took materially adverse employment action against him; and (c) there was a causal connection between the protected activity and the material adverse action.

115.    Plaintiff engaged in protective activities of grieving his suspensions and non-reappointment.

116.    Defendant took materially adverse employment action against Dean Akhavi in wrongfully suspending him and not reappointing him as Dean of the STEM Department.

24

117.    As stated herein, a causal connection exists in proximity between Dean Akhavi's grieving his suspensions and nonreappointment and the final decision of TNCC's President affirming Dr. English's recommendation not to reappoint Dean Akhavi.

118.    Defendant was aware of Plaintiff's protected activity in that it was party to Plaintiff's grievances at the College and VCCS levels and the EEOC charge of discrimination.

119.    Defendant's conduct was a direct and proximate cause of the injuries, damages, and harm Plaintiff suffered.

120.    As a further result of Defendant's above-stated actions, Plaintiff has been, is being, and will be deprived of economic benefits as his employment record will be scrutinized whenever he seeks similar employment and advancement.

121.    As a direct and proximate result of the unlawful conduct of Defendant, Plaintiff has suffered, and will in the future suffer, great damages including loss of economic benefits, loss of career opportunities, promotions and advancements; loss of fringe benefits; embarrassment, humiliation, and inconvenience; severe mental anguish, stress, and pain and suffering; loss of enjoyment of life and other nonpecuniary injury in amounts to be determined at trial.

122.    Additionally, Plaintiff has incurred and continues to accrue attorneys' fees and other legal costs to vindicate his federally protected rights.

### JURY DEMAND

Plaintiff hereby demands trial by jury on the claims set forth herein.

### PRAYER OF RELIEF

**WHEREFORE,** Plaintiff respectfully requests judgment as follows:

a.    injunctive relief on the 42 U.S.C. § 2000 claim, enjoining Defendant from continuing racially discriminatory policies;

      b.      compensatory and punitive damages in a yet undetermined amount on the 42 U.S.C. § 1981 Title VII claim; for past and future economic and non-economic losses, including extreme emotional distress and mental anguish, impairment of the quality of life; and consequential loses;

      c.      reasonable expenses and attorney's fees incurred in bringing this action; and

      d.      such other relief as the Court deems just and proper.

Respectfully submitted,

By: _____

Dated: February 2, 2021

Veronica E. Meade (VSB 66727)
V. MEADE LAW, PLLC
1100 Exploration Way, Suite 302V
Hampton, VA 23666
Tel:   (757) 826-8000
Fax:   (757) 826-8001
Email: veronica@vmeadelaw.com

*Counsel for Plaintiff*